Plaintiff, Theresa Rendueles, age 59, fell through a skylight on May 5, 1944, on the premises of her employer, while working as a seamstress operating an electrically driven sewing machine, and sustained injuries.
She was paid workman's compensation weekly at the rate of $10.40 for 120 weeks, when the payments ceased. Claiming to be totally and permanently disabled, plaintiff filed this suit, in forma pauperis, against the employer, a partnership known as A. Solomon, the partners thereof, and the partnership's insurance carrier, Standard Accident Insurance Company. The prayer is for compensation at the rate of $10.40 for 280 weeks, plus $500 medical expenses. The defense is that plaintiff suffers no disability and is not entitled to further compensation.
From a dismissal of her suit, after a trial on the merits, plaintiff has prosecuted this appeal.
Plaintiff depends entirely upon lay testimony for the establishment of her case. After the fall, she was taken first to the Charity Hospital and then removed to the Hotel Dieu where she stayed for about nine weeks. She remained in bed at her home for one month, then used a wheel chair for another month, after which she walked with the aid of crutches for about two months. For a time thereafter, she used a cane.
Plaintiff claims that she cannot walk, sit, or stand for long periods, because of a stiffness in the back and pains in her right hip. She complains of cramps in the right leg, nervousness, and loss of sleep. She finds it necessary to wear a corset prescribed by Dr. Geismar, and according to her testimony she cannot get in or out of the bathtub or bed without help. Plaintiff insists that she is unable to return to her employment because, "I wouldn't go there for a day and then they would lay me off because I couldn't do the work and sit down enough; and no boss will hire you where you have to sit down, stand up and sit down again."
A niece, with whom plaintiff lives, testified that Miss Rendueles suffers severe pains in the right pelvis, and that she is unable to work around the household, except to help in the kitchen. Plaintiff is being supported by this niece and a nephew. The nephew testified that while he does not live with plaintiff, he sees her practically every day, and that she complains of pains in her right leg, is unable to work, and that he helps to support her.
Three medical experts appeared for the defendants. Dr. Geismar first saw plaintiff on the day of the accident and treated her until sometime in 1945. X-ray plates showed fractures of the transverse processes of the fourth and fifth lumbar vertebrae on the right side; a fracture of the superior border of the sacrum, with separation of the right sacro-iliac joint; and a fracture of the rami of both the right and left pubis. During treatment, the patient developed an infarct of the lung, and also *Page 466 
a bladder disturbance. Dr. Geismar saw plaintiff at intervals at her home. The last time he saw her, the X-ray pictures showed that the fractures had healed with perfect union. By January, 1945, plaintiff was walking without aids, and his advice was that she should use and exercise her legs, and that if she would do so she would experience no further difficulty. According to Dr. Geismar, the only residual is a ten per cent disability in extreme bending.
Dr. Warren L. Rosen, a general surgeon who had much orthopedic experience as a member of the medical corps of the Army, made an examination on December 20, 1945. Plaintiff complained of stiffness which limited motion of the back and trunk, and asserted that she could not sit or stand for long periods without pain. Dr. Rosen's examination disclosed that the patient moved with caution, as though afraid of falling, but that he noticed no limp. However, she was able to bend forward and could almost touch the floor with her hands, and was also able to hyperextend her back and move freely from side to side. Muscle spasm was present in the great lumbar muscle, without evidence of any inflammatory process. Dr. Rosen's opinion was that if plaintiff had exercised her muscles she would have been able to return to her former work and proceed with her usual duties. He stated that the complaints referred to muscle tone, and the other symptoms, such as back pains, etc., could be attributed to hypertrophic changes because of plaintiff's age. Dr. Rosen agreed that the ten per cent disability mentioned by Dr. Geismar would probably result from muscle tone. He testified:
"A. * * * I mean by that, you take the case of a longshoreman who has been out of work for two months or six months or a year and put him back to carry sacks on his back. The first time he goes back he has a disability; he cannot do that the first time. His muscles have not been built up; but using them continually over a few weeks he will rebuild the muscles to the point where he won't have a disability. I think the same thing appears in this case.
"Q. You think if Miss Rendueles actually exercised her muscles she would be able to resume her work and that the bones of her leg and pelvis have knitted sufficiently to enable her with the new muscle tone to proceed to her usual duties? A. I feel that way."
Dr. Theodore Simon examined plaintiff on April 22, 1946, and rendered a written report dated April 27, 1946, which was admitted into evidence, it being stipulated by counsel that the testimony of Dr. Simon, if present, would coincide with the recitals of the statement. It does not appear that the report was filed, as it is not contained in the record; however, a reference to Dr. Geismar's testimony discloses that Dr. Simon found that plaintiff walked with some favoring of the right lower extremity producing a tendency to limp, with tenderness of the rounding of the dorsal spine, and that on forced internal and external rotation of the right hip the patient complained of pain at the hip joint. Dr. Simon estimated the residual to be about ten per cent of the body as a whole, which condition would not prevent plaintiff from returning to her former employment.
Plaintiff's counsel urges us to disregard the testimony of the medical experts and to adopt that of plaintiff and her witnesses as the basis for formulating an opinion in this case. He argues that courts sometimes accept lay testimony in preference to that of medical experts. However, whenever that course was pursued it was because the experts were in irreconcilable disagreement, or the testimony was not helpful to the court, which is not the case here. Counsel also advances the argument that a workman's disability resulting from hysteria traceable to the accident is equally as compensable as physical injuries. However, there was no showing made that plaintiff is laboring under a neurosis, nervousness, or an emotional disorder. Plaintiff herself asserts that she cannot do her former work because of physical pain, and that alone, according to her testimony, is the ground upon which she bases her right to compensation.
The record clearly demonstrates that plaintiff's complaints result from the failure to properly exercise her limbs, as recommended by Dr. Geismar. Plaintiff admits that she did not take the prescribed exercise, *Page 467 
and gave as the reason that the process was painful. Plaintiff was also advised that she should endeavor to engage in her former occupation, as the work, which required the use of the legs, would be beneficial. Her employer offered to reemploy her and attempted to induce her to return, but she declined because of her belief that she was unable to perform the duties of the job. There is another circumstance which must be taken into consideration. Although claiming to be incapacitated and suffering severely, plaintiff has sought no medical attention since being discharged by Dr. Geismar in 1943. It was testified to that she did not seek further treatment because she is without funds; but why she did not visit Charity Hospital or some like institution caring for indigent persons was never explained.
A question of fact only is involved, which was resolved by the lower court adversely to plaintiff. Our examination of the record reveals that there is no manifest error in the judgment, but on the contrary it appears to be correct and fully warranted by the great weight of the evidence.
For the above reasons, the judgment appealed from is affirmed.
Affirmed. *Page 594